[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION FINDINGS OF FACT:
1. In September 2000, the Plaintiff had the artists Joe Bell and Abdullah Perkins (hereinafter referred to as the "L.A.B.zz") under Exclusive Recording Contracts.
2. In September 2000, the Plaintiff signed the artist Natasha Ramos to an Exclusive Recording Contract.
3. In October 2000, the Plaintiff continued to devote his talent and experience to develop the L.A.B.zz and to develop his new artist, Natasha Ramos, by providing studio-recording time for the Artists to record their singing talents, which were to be featured in the production of an album.
4. In early November 2000, while recording the Artists at the Planet of Sound recording studio in Hartford, Connecticut, the Plaintiff was introduced to the Defendant, C. Tate George, for the purpose of obtaining investment in the Plaintiffs recording project featuring the Artists.
5. In mid November 2000, the Plaintiff and the Defendant entered into negotiations to form a business relationship for the purpose of operating and managing an independent record company (hereinafter referred to as the "Company").
6. Pursuant to said negotiations, the Plaintiff and the Defendant entered into a "Partnership Agreement" on December 16, 2000 (Plaintiffs Exhibit 1).
(a) with respect to the operation and management of the Company the agreement provided:
(i) the Plaintiffs duties and responsibilities included making CT Page 132 decisions as to the process of producing and promoting the Artists and their music; and
 (ii) the Defendant's duties and responsibilities included the financial management of the Company, as well as, making decisions as to the promotion of the Artists and their music.
(b) with respect to investment into the Company the agreement provided:
 (i) the Plaintiff agreed to release the Artists from their Recording Contracts with him and provide his knowledge and experience of the music industry; and
 (ii) the Defendant agreed to make a financial investment in order to operate the Company and produce the Artists' music.
(c) on or about December 1, 2000, the Plaintiff released the Artists from their exclusive Recording Agreements with him and the Artists executed new exclusive Recording Artist Agreements with the Company (Plaintiffs Exhibits 2-6); and
7. At all times relevant hereto, the Defendant never opened a separate and distinct bank account for the Company, but, rather paid the Company expenses from a bank account he held jointly with his girlfriend, Dina LaPenta. (Plaintiffs Exhibit 21 and Defendant's Exhibit C.)
8. On or about December 11, 2000, the Plaintiff submitted an order for approximately 2000 compact discs and 300 vinyl discs containing the maxi-single entitled "Uh Oh." (Plaintiffs Exhibit 7 and 8.)
9. On or about December 15, 2000, the Company hosted a "Listening Party" for the Artists at the Velvet Nightclub located on Union Place, Hartford, Connecticut.
10. Thereafter and through February 8, 2001, the Artists performed at several other venues. Both the Plaintiff and the Defendant testified that all of the Artists' performances were well received by those in attendance.
11. Shortly after December 16, 2000, the Plaintiff indicated to the Defendant and Ms. Billie that, in order for the Artists to record new music, the Company would need to purchase a "drum machine."
12. On or about December 27, 2000, the Plaintiff and Ms. Billie went to CT Page 133 LaSalle Music and placed a deposit in the amount of $500.00 on a MPC2000XL Integrated Rhythm Machine (hereinafter referred to as the "Machine"). (Plaintiffs Exhibits 16 and 17; Defendant Exhibit B.) The $500.00 was provided by Ms. Billie.
13. On or about January 4, 2001, the Plaintiff and Defendant received the aforementioned order of compact discs and vinyl discs for distribution to retailers and radio stations, respectively. (Plaintiffs Exhibit 8.)
14. Thereafter, the maxi-single "Uh Oh" compact discs were distributed to the retailer "Record Express" for sale at their Connecticut locations and some Massachusetts locations, and at certain "mom'n pop" record retailers in New Haven, Connecticut and Springfield, Massachusetts.
15. On February 8, 2001, the Plaintiff and the Defendant went to La Salle Music to take possession of a MPC 2000 XL. The balance of $2,000.00 was paid by the Defendant.
16. After picking up the Machine, the Plaintiff and the Defendant drove to Springfield, Massachusetts to have a different memory chip installed in the Machine, after which the Plaintiff and the Defendant returned to Connecticut.
17. On or about February 9, 2001, the Artists were scheduled to perform at the Expo in Hartford, Connecticut, and did so.
18. On or about February 11, 2001, the Artists were scheduled to appear at an autograph signing, and did so.
19. On or about February 11, 200 1, the Plaintiff contacted the Defendant by telephone to inform him as to the success of the autograph signing.
20. During said telephone conversation, the Defendant renewed his request to add another partner, which, once again, the Plaintiff unequivocally refused to allow. Thereafter, the Defendant exclaimed that the Partnership was over and hung up the phone on the Plaintiff.
21. On or about February 12, 2001, the Defendant appeared at the Plaintiff's residence demanding the MPC 2000 machine and the master recordings of the thirteen songs the Plaintiff produced for the L.A.B.zz. The Plaintiff refused to give the Defendant the MPC 2000 machine. The Plaintiff, however, did give the Defendant a box containing the master recordings and a box of L.A.B.zz merchandise and flyers. CT Page 134
22. In February, shortly after the incidents of February 12, 2001, the Plaintiff and L.A.B.zz traveled to New York City and performed at Rikers Island. Once again, the L.A.B.zz performance as well received by those in attendance.
23. After February 12, 2001, the Defendant had no further contact with the Plaintiff until approximately February 20, 2001, when the Plaintiff received a letter from the Defendant. (Plaintiffs Exhibit 9.)
24. The February 20, 2001 letter does not contain a formal notice of termination of the partnership, but, rather, demands the return of the Machine and the L.A.B.zz master recordings.
25. On or about March 19, 2001, the Plaintiff received a letter, dated March 19 2001 from the L.A.B.zz stating their intention to sever their contractual ties with the Plaintiff. (Defendant's Exhibit D.) This letter was occasioned by disagreements between L.A.B.zz and Ms. Billie.
26. On or about April 2, 200 1, the Plaintiff received another letter from the Defendant, wherein the Defendant gives "formal termination notice of [the] partnership." (Plaintiff's Exhibit 11.)
27. From April 2, 2001 through April 12, 2001, the Defendant made three (3) telephone calls to the artists Joe Bell and Abdullah Perkins at Mr. Bell's Springfield, Massachusetts residence. (Plaintiffs Exhibit 19 at pages 52-57.)
28. On or about April 12, 2001, the Plaintiff received another letter from the Defendant, wherein the Defendant formally terminates the partnership. (Plaintiffs Exhibit 12.)
29. The Defendant dissolved the partnership without offering an accounting of the partnership assets and/or liabilities.
30. The Defendant testified that, after the dissolution of the partnership, he continued to work with the L.A.B.zz and Natasha Ramos with the knowledge that he had no right to do so pursuant to Termination provisions of the Operating Agreement.
31. The Defendant testified that, after the dissolution of the partnership, he incurred expenses on behalf of Ms. Ramos in the amount of $171,514.70. (Defendant's Exhibit P.)
CONCLUSION AND ORDERS:
CT Page 135
1. Defendant does not owe Plaintiff any money for producing songs.
2. Defendant paid $2,000.00 for the MPC 2000 XL. Ms. Billie paid $500.00 for the MPC 2000 XL.
3. The MPC2000 XL shall be turned over to the Defendant if the Defendant tenders $500.00 to the Plaintiff within sixty days of this judgment. If such tender is not made the MPC 2000 shall be an asset of the LLC.
4. The Defendant interfered with the Plaintiffs contracted rights concerning the artists, L.A.B.zz and Natasha Ramos.
5. The Defendant's interference did not damage the Plaintiff.
6. Upon termination of the Limited Liability Company the artists were contractually bound to the Plaintiff.
7. Within sixty days of the judgment Defendant shall provide Plaintiff with a profit and loss statement for the Limited Liability Company, the plaintiff may within 20 days of this order request a profit and loss statement proposed by an independent third party provided the plaintiff at the time of such request pays half of the costs of such services.
8. No costs are taxed to either side.
BY THE COURT
 ___________________ BOOTH, J.
CT Page 136